UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KATHY R. KAMINSKI,

Plaintiff,

-vs- 08-CV-247C

ROBERT ANDERSON and
TOWN OF AMHERST,

Defendants.

---

APPEARANCES: HOGAN WILLIG (STEVEN M. COHEN, ESQ., Of Counsel), Amherst, New York, Attorneys for Plaintiff.

BOUVIER PARTNERSHIP, LLP (DALE A. EHMAN, ESQ., Of Counsel), Buffalo, New York, Attorneys for Defendants.

**BACKGROUND**

This case was originally filed in New York State Supreme Court, Erie County, on March 4, 2008. It was removed to this court in accordance with 28 U.S.C. § 1441 on March 24, 2008 (Item 1). Plaintiff seeks damages and a permanent injunction pursuant to 42 U.S.C. § 1983 for the alleged violation of her First Amendment rights in retaliation for her decision to run for Superintendent of the Amherst Highway Department in 2007.

The defendants filed an answer to the complaint on March 24, 2008 (Item 3). Discovery was completed by October 4, 2010, and defendants filed the motion for summary judgment on December 2, 2010 (Item 25). Plaintiff filed a response to the motion on January 18, 2011 (Items 40 - 43), and defendants filed reply affidavits on

February 1, 2011 (Items 44, 46). The court declined to hear oral argument. For the reasons that follow, the defendants' motion for summary judgment is denied.

## FACTS[1]

Plaintiff commenced her employment with the Town of Amherst Highway Department on December 24, 1989 (Item 40, Exh. A, hereafter "Kaminski Dep.," p. 7). She worked for approximately 14 years in the Parks Division, located on Maple Road in the Town of Amherst, New York. In 2005, plaintiff was the Working Crew Chief in the Forestry Division. *Id.,* p. 11. At that time, the operations of the Forestry Division were moved to the Highway Department facility on North Forest Road in Amherst. *Id.,* p. 8. Kent Richter was the General Crew Chief and became plaintiff's supervisor. *Id.,* pp. 24, 28. As Working Crew Chief, plaintiff supervised a crew of from 8 to 18 laborers. *Id.*, p. 29. Plaintiff testified that she had differences of opinion with Kent Richter periodically during his tenure as her supervisor. *Id.,* p. 80. She met with defendant Anderson, the Superintendent of the Highway Department, regarding her problems with Richter on approximately four occasions. *Id.,* p. 82. On one occasion, plaintiff expressed a desire to leave the Forestry Division, but Anderson told her to work out her differences with Richter. *Id.,* p. 85.

In May 2007, plaintiff was asked to run for the office of Superintendent of the Highway Department as the nominee of the Democratic Party, and she accepted the

---

[1] The factual statement is taken from the parties statements pursuant to Local 56.1 (Items 27, 43), transcripts of the depositions taken in the case (Items 30-36, 40), plaintiff's affidavit in opposition to the motion (Item 42), and the affidavits filed in support of the motion (Items 44, 46).

nomination (Item 42, ¶¶ 5-6). The incumbent Superintendent, defendant Anderson, was the Republican nominee for the office. *Id.,* ¶ 7. In May or June 2007, defendant Anderson approached Larry Taber, plaintiff's then-fiancé, and asked him if plaintiff was running for Highway Superintendent. Taber assured Anderson that plaintiff was not running (Item 40, Exh. B, hereafter "Anderson Dep.," pp. 19-20; Item 42, ¶ 8). A few days later, Anderson learned that plaintiff had asked for the Independence Party endorsement, which had already been given to Anderson. *Id.,* p. 23. On June 12 and 13, 2007, formal announcements were made regarding plaintiff's candidacy (Item 42, ¶ 9). Anderson again approached Taber and angrily accused Taber of having lied to him (Anderson Dep., p. 23). Larry Taber testified at his deposition that he told Anderson that plaintiff had been approached to run but had not decided (Item 40, Exh. G, p. 16). Later, after the announcement was made, Anderson told Taber, a life-long friend, that they were finished and not to ask for another favor. *Id.,* p. 20.

On June 14, 2007, plaintiff's supervisor, Mr. Richter, told her to remove all the equipment from the room that was being used as the office for the Working Crew Chief of the Forestry Division. He explained that the adjacent ladies' room was going to be expanded and made handicap-accessible (Kaminski Dep., pp. 57-58). Plaintiff testified that those renovations were never done. *Id.*, p. 66. Richter testified that the Forestry office was closed and that the files and telephone were moved into his office so as to consolidate and streamline the operation. Additionally, the front office was expanded, and the women's restroom was made handicap-accessible (Item 40, Exh. C, hereafter "Richter Dep.," p. 30). The other crew chiefs felt plaintiff should be in the crew chiefs' office, not in her own Forestry office. *Id.,* p. 34.

Plaintiff was thereafter put in charge of the crew that responded to stump removal requests (Kaminski Dep., p. 68).  She no longer was able to respond to residents' calls as she was not situated in an office with a telephone.  *Id.,* p. 67.  She was no longer in charge of tree planting or tree removal.  *Id.,* p. 70.  Richter was occasionally observed removing or changing work orders from plaintiff's work area in the crew chiefs' office (Item 40, Exh. E, pp. 16, 31).  He admitted as much, but explained that he needed to keep apprised of the work load (Richter Dep., p. 37).

In approximately September 2007, plaintiff was taken off of stump removal duty and was assigned to oversee the scrap yard and the pick-up of scrap metal in the Town of Amherst (Kaminski Dep., pp. 87-88).  Anderson decided to put plaintiff in charge of the yard and metal pick-up because there were "complaints about her work ethic, her duties not being performed, her lack of being available during work hours . . .[and] she was off a lot comparatively to the other crew chiefs" (Anderson Dep., p. 13).  Richter testified that plaintiff was removed from Forestry and assigned to the yard because she was not performing as well as expected (Richter Dep., p. 47).  It was plaintiff's understanding that her assignment to the yard was a form of punishment (Item 42, ¶ 21).

Plaintiff testified that for the duration of the yard assignment, she was told that she could not leave the yard (Kaminski Dep., pp. 90-91).  Confined to the yard, plaintiff was not able to work overtime on jobs that continued past 5:00 p.m. as she had previously done.  *Id.,* pp. 94-95.  She was also unable to check on the work status of the metal pick-up crews.  *Id.,* p. 98.  She was not able to spend time in the office, but was told to stay outside and supervise the yard.  *Id.,* p. 108.  Anderson denied

specifically instructing plaintiff that she was not to leave the yard (Anderson Dep., pp. 27-28).

On December 7, 2007, plaintiff was working in the yard. It was a very cold day, and she spent much of it driving around the yard in her truck. (Kaminski Dep., p. 113 - 14). She was not feeling well, and went home for lunch at approximately noon. She then proceeded to the hospital. *Id.,* p. 116 - 18. At the hospital, plaintiff was given oxygen and had blood work done. When she followed up with her personal physician approximately one week later, plaintiff was told that she had been sickened by carbon monoxide and should not spend so much time in her vehicle. *Id.,* pp. 121-22. Nonetheless, when she returned to work, plaintiff was instructed to stay in the yard in her truck. *Id.,* p. 126.

In February 2008, plaintiff was transferred to the Parks Division and was placed in charge of the maintenance of the Town of Amherst Audubon Golf Courses (Kaminski Dep., pp. 129-30). When she was transferred, plaintiff was assigned a different truck, an old Chevrolet that was difficult to climb into and operate. *Id.,* p. 133 - 34. The general crew chief installed a step so that plaintiff could climb in, but the seat was locked in position so that plaintiff could not easily reach the brake and gas pedals. *Id.,* p. 135. Following the election, in which Anderson was reelected, plaintiff approached him about being reassigned back to the Forestry Division. Anderson told her that she would need to earn his trust. *Id.,* p. 186.

Plaintiff testified that a now-deceased secretary told her that defendant Anderson instructed her not to speak with plaintiff on town time (Kaminski Dep., p. 150).

Anderson denied ordering any town employees to shun plaintiff or not speak to her (Anderson Dep., p. 37). Plaintiff also stated that she lost overtime opportunities by being listed as an "extra" on the Town's snow-plowing list (Kaminski Dep., pp. 99, 193-94). In her affidavit, plaintiff stated that she was assigned to work with employees whom other crew chiefs did not want to work with for various disciplinary reasons (Item 42, ¶ 20). She stated that her son and husband have also been subjected to incidents of retaliation. Specifically, her son was removed from his position in the Signal shop of the Highway Department "for no apparent reason." *Id.,* ¶ 42. Her husband, a former Highway Department employee, manages the Audubon Golf Course on an annual contract basis, and the compensation offered in the 2010 contract was 50 percent less than the amount offered in the previous nine years. *Id.,* ¶ 41.

## DISCUSSION

### 1. Summary Judgment Standard

The standards for summary judgment are well settled. Pursuant to Federal Rules of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Grp., LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The

court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomm.,*

*Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

**2. First Amendment Claim**

Plaintiff brings this First Amendment retaliation claim pursuant to 42 U.S.C. § 1983. Civil liability is imposed under section 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. *See* 42 U.S.C. § 1983. On its own, section 1983 does not provide a source of substantive rights, but rather a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to section 1983, it is necessary to precisely identify the constitutional violations alleged. *See Baker*, 443 U.S. at 140. Here, plaintiff alleges that the defendants violated her rights to freedom of expression and to political association under the First Amendment.

The Second Circuit has explained that in order for a public employee to establish a First Amendment retaliation claim, plaintiff must prove that: (1) she engaged in constitutionally protected speech or conduct on a matter of public concern; (2) she suffered an adverse employment action; and (3) the speech or conduct was a “motivating factor” in the adverse employment decision. *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 105-06 (2d Cir. 2006), *overruled on other grounds by Appel v. Vill of Mamaroneck,* 531 F.3d 138, 140 (2d Cir. 2008) ; *Gronowski v. Spencer,* 424 F.3d 285, 292 (2d Cir. 2005); *Sheppard v. Beerman,* 94 F.3d 823, 827 (2d Cir.1996).

However, defendants may still "escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Skehan,* 465 F.3d at 106.

Defendants do not dispute that plaintiff engaged in constitutionally protected speech and expressive conduct in her campaign for the office of Highway Superintendent. They argue, however, that plaintiff has failed to establish an adverse employment action that was substantially motivated by the exercise of her Fist Amendment rights.

"In the context of a First Amendment retaliation claim . . . retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech*., 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted), *cert. denied,* 549 U.S. 1342 (2007). "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). However, "lesser actions may also be considered adverse employment actions." *Id.; see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002). "Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." *Phillips v. Bowen,* 278 F.3d at 109 (citing *Bernheim v. Litt,* 79 F.3d 318, 324–25 (2d Cir.1996)).

Here, plaintiff offers a litany of employment actions that she endured following her decision to run for the elected position held by defendant Anderson. She states that her office was dismantled, she was stripped of responsibilities she previously undertook, work orders were removed from her desk, and she was transferred to the yard, an action that was seen by her and other employees as punishment. Additionally, she was confined to the yard, assigned allegedly defective vehicles, and was placed on the snow-plowing list as an "extra," resulting in the loss of overtime opportunities. Plaintiff states that she was assigned to work with employees who had disciplinary problems, and her family suffered retaliatory actions. Plaintiff argues that while any single action taken in isolation may seem trivial, the aggregate of these actions are sufficient to raise a genuine issue of fact as to whether she was subjected to adverse employment actions in retaliation for the exercise of her Fist Amendment rights.

This is a close case. Plaintiff was neither discharged, demoted, nor formally disciplined, and never suffered a loss of pay, seniority, or benefits. The most significant allegations are that she was transferred to an undesirable assignment and limited in her overtime opportunities. Essentially, the parameters of plaintiff's job were changed to her dissatisfaction. While single instances of allegedly adverse action, like the loss of her dedicated work space or the assignment of an older truck, seem insignificant, her transfer from Forestry duties to the supervision of a junkyard with instructions not to leave the yard, either to enter the building or to supervise her work crews, appears punitive. In fact, both Anderson and Richter testified that plaintiff was reassigned for various performance reasons, including complaints about her "work ethic" and the amount of vacation time she took, while at the same time denying that her

reassignment was punitive in nature. Additionally, while Anderson denied that he personally instructed plaintiff to stay in the yard at all times, he admitted hearing a "rumor" to that effect and, though it was unusual, he declined to address the situation (Anderson Dep., p. 28). The record reflects that defendant Anderson was not pleased with plaintiff's decision to run for his position and felt betrayed by the lack of candor of plaintiff's husband. Following the election, when plaintiff requested that she be returned to the Forestry Division, Anderson told her that she would have to earn his "trust" (Kaminski Dep., p. 186). Viewing the record in its totality, and affording the plaintiff the benefit of all reasonable inferences, a jury could conclude that defendants took employment actions that would deter a similarly situated individual of ordinary firmness from exercising her constitutional rights. Accordingly, plaintiff has raised a genuine issue of fact on the question of adverse employment action.

As part of plaintiff's *prima facie* First Amendment retaliation claim, plaintiff must also demonstrate a "'causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)). It is well settled that proof of causation may be shown indirectly by, *inter alia*, demonstrating that the protected activity was followed closely by a retaliatory action. *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir. 2001). Courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation. *See, e.g., Ruhling v.*

*Tribune Co.*, 2007 WL 28283, at *23 (E.D.N.Y. January 3, 2007) (finding that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); *Cunningham v. Consol. Edison, Inc.*, 2006 WL 842914 at *19 (E.D.N.Y. March 28, 2006) (passage of two months "seems to be the dividing line."). Here, there is no question but that the complained of actions commenced shortly after plaintiff announced her intention to challenge defendant Anderson for the office of Superintendent and continued during the campaign season. Thus, plaintiff has satisfied this element of the *prima facie* case.

 Finally, it is well settled that "even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have take the same adverse action in the absence of the protected speech." *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998). Thus, "[c]onduct that is properly initiated, reasonably executed, independently justified and equally administered–regardless of any animosity towards the plaintiff–does not give rise to a constitutional claim for retaliatory harassment." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 109 (2d Cir. 2000).

 Here, defendants have offered proof that plaintiff had differences of opinion with Mr. Richter before her campaign commenced, even to the point that she asked to be removed from her position in the Forestry Division. Anderson and Richter both testified that plaintiff was reassigned from Forestry to the yard and metal pickup because of performance issues, not because of her decision to run for elected office. Richter testified that the Forestry office was dismantled so as to streamline the operations of

the Forestry Division and to accommodate an expansion of the women's restroom. He also stated that the other crew chiefs felt that plaintiff should work out of the crew chiefs' office, rather than her own work space.

While defendants have established that some of the alleged adverse employment actions would have been taken regardless of plaintiff's campaign for the Superintendent position, plaintiff has offered sufficient evidence to raise a genuine issue of material fact. Anderson stated that plaintiff was reassigned for her performance, but that the reassignment it was not punitive or disciplinary. To the contrary, it appears that her reassignment was a disciplinary action. Finally, Anderson's statement to plaintiff after the campaign that she needed to regain his "trust" indicates that plaintiff may have suffered the adverse employment actions in retaliation for the exercise of her Fist Amendment rights. Viewing the evidence in the light most favorable to plaintiff and affording her the benefit of every reasonable inference, plaintiff has raised a genuine issue of fact as to whether retaliation was a motivating factor in the employment decisions. Accordingly, the defendants' motion for summary judgment on this basis is denied.

**3. Municipal Liability**

Defendants contend that the section 1983 claim against the Town of Amherst should be dismissed, as the municipal defendant did not violate plaintiff's constitutional rights. "[A] municipality cannot be held liable solely because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can

demonstrate that the allegedly unconstitutional action of an individual . . . [public] official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of New York,* 2006 WL 401651, *4 (E.D.N.Y. February. 22, 2006) (internal quotation marks omitted) (quoting *Monell*, 436 U.S. at 690). However, "the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference . . . ." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (internal quotation marks omitted).

In addition to demonstrating directly that a municipality has a custom or policy that led to a constitutional violation, the Second Circuit has held that a plaintiff may demonstrate municipal liability by showing that a municipal "policymaker" violated plaintiff's constitutional rights:

> Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, or by a [municipal] employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the [municipality's] authorized policymakers.

*Amnesty America v. Town of West Hartford,* 361 F.3d at 126; *see also Gronowski v. Spencer*, 424 F.3d at 296 ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights."); *Davis v. Lynbrook Police Dep't*, 224 F.Supp.2d 463, 478 (E.D.N.Y. 2002) ("A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a

final policymaker directly committed or commanded the constitutional violation . . . .). Indeed, "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy." *Gronowski,* 424 F.3d at 296 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).

In particular, where a municipal official "'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Gronowski*, 424 F.3d at 296 (quoting *Rookard v. Health and Hosps. Corp*, 710 F.2d 41, 45 (2d Cir. 1983)); *see also Anthony v. City of New York,* 339 F.3d 129, 139 (2d Cir. 2003) ("An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions."). Moreover, "the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the [municipality's] business." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.) (internal quotation marks omitted), *cert. denied,* 531 U.S. 813 (2000).

Here, it is undisputed that defendant Anderson held "the highest supervisory and managerial position of the Highway Department" (Item 27, ¶ 2). He was the final policy maker in the Town of Amherst Highway Department and had the discretionary authority over personnel decisions. Anderson testified that he ordered plaintiff to be assigned to the yard and metal pick-up and declined to intervene when he heard of the unusual circumstances of her confinement to the yard. Accordingly, if plaintiff proves that she suffered retaliation for the exercise of First Amendment rights, the Town of Amherst may be liable for those actions taken by defendant Anderson. Accordingly, the motion

for summary judgment of the Town of Amherst on the grounds of municipal liability is denied.

**4. Qualified Immunity**

Finally, defendant Anderson contends that his actions are protected by the doctrine of qualified immunity.[2] It is well settled that government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding v. Tollaksen*, 257 F. Appx. 400, 401 (2d Cir. 2007) (government officers "are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law"). For purposes of qualified immunity, "[a] right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. . .. [T]he unlawfulness must be apparent." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) (internal quotation marks omitted). In addition, the Second Circuit has repeatedly stated that qualified immunity only protects officials performing "discretionary functions." *See Simons v. Fitzgerald,* 287 F. Appx. 924, 926 (2d Cir. 2008); *Piscottano v. Town of Somers*, 396 F.Supp.2d 187, 208 (D.Conn. 2005).

---

[2] To the extent that defendants seek qualified immunity for the Town of Amherst as well, the court notes that "[m]unicipalities do not enjoy either absolute or qualified immunity from suit under Section 1983." *White River Amusement Pub, Inc. v. Town of Hartford*, 412 F.Supp.2d 416, 429 n. 6 (D.Vt. 2005), *aff'd*, 481 F.3d 163 (2d Cir. 2007) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166 (1993)).

At the summary judgment stage, the Second Circuit has held that courts should cloak defendants with qualified immunity "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir.1996)); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir.1994) ("Though [qualified] [i]mmunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." (internal citations and quotation marks omitted)), *cert. denied,* 513 U.S. 1076 (1995).

Here, it is axiomatic that the right that plaintiff asserts–her right under the First Amendment to be free from retaliation for political speech and conduct in running for public office–is clearly established. *See Flinn v. Gordon*, 775 F.2d 1551, 1554 (11th Cir. 1985), *cert. denied,* 476 U.S. 1116 (1986) (constitutional right to run for elected office); *see also Dobosz v. Walsh*, 892 F.2d 1135, 1141 (2d Cir.1989) ("the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established").

Additionally, as described above, the court has found that genuine issues of material fact preclude a determination as a matter of law that this clearly established right was not violated. Thus, the critical question is whether it was objectively

reasonable for defendant Anderson to believe that he was not committing such violations. According to the Second Circuit, the very fact that this court has determined that a rational jury could find, if all of plaintiff's evidence is credited and all reasonable inferences are drawn in her favor, that the individual defendant retaliated against plaintiff for exercising her First Amendment rights, is sufficient to preclude the court from determining as matter of law that the individual defendants' actions were objectively reasonable.

> Where specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity is inappropriate. In the present case retaliatory intent is an element of plaintiff's claim, and we have already noted that plaintiff's evidence of retaliatory animus is sufficient to make defendants' motivation a triable issue of fact. Until that issue is resolved by a factfinder, therefore, the retaliation claim against [the defendant] cannot be dismissed on qualified immunity grounds.

*Mandell v. County of Suffolk*, 316 F.3d at 385 (internal cite omitted).

The court has determined, crediting plaintiff's version of events and granting her the benefit of all reasonable inferences, that a rational jury could find that defendant Anderson retaliated against plaintiff based upon her First Amendment activity. Under these circumstances, given the disputed facts, the court declines to conclude as a matter of law that defendant Anderson's conduct was objectively reasonable. Accordingly, defendant Anderson's motion for summary judgment on qualified immunity grounds is denied.

## CONCLUSION

The defendants' motion for summary judgment is denied. The court will conduct a telephone conference on June 22, 2011 at 2 p.m. to establish a further schedule.

So ordered.

_______\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated: May 25, 2011
p:\pending\2008\08-247.mar2811